UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KENNETH McKAY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 13-10521-PBS |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
June 30, 2014

Saris, U.S.D.J.

**I. INTRODUCTION**

Plaintiff Kenneth P. McKay moves to reverse the Commissioner's denial of his application for Social Security Disability Insurance benefits under 42 U.S.C. § 405(g), arguing that the Administrative Law Judge ("ALJ") erred by failing to find that plaintiff's left shoulder impairment was a disabling impairment. Defendant moves to affirm the decision of the Commissioner. The Court **DENIES** both plaintiff's Motion to Reverse (Docket No. 15), and defendant's Motion to Affirm (Docket No. 20). The Court **VACATES** the Commissioner's decision that plaintiff is not disabled under the Social Security Act, and the case is **REMANDED** for further proceedings consistent with this order.

**II. FACTS**

Plaintiff was twenty-eight years old when he filed his

application for Social Security Disability Insurance benefits on December 10, 2009. R. 18 (Docket No. 14). He had previously worked as a personal care attendant, delivery driver, metal worker, retail manager, security guard, laborer, store clerk, and dishwasher. Id. Plaintiff alleged that his disability made him ineligible to work beginning December 4, 2009, due to rheumatoid arthritis of the spine and multiple disc herniations. R. 70. His initial request was denied. R. 70-72. Plaintiff alleged worsening pain and asthma as the basis for disability in his request for reconsideration, which was denied on November 2, 2010. R. 74-76. On August 22, 2011, roughly three months before his administrative hearing, he was in a motor vehicle accident that hurt his left shoulder. R. 396-97.

**A. Medical History**

Plaintiff's shoulder impairment is the main issue on review before the Court.[1] At 1:30 p.m. on August 22, 2011, plaintiff arrived at the North Shore Medical Center/Salem Hospital Emergency Department after a motor vehicle accident, complaining of pain in his left shoulder. R. 396. The "ED Physician Documentation" notes indicate that his symptoms were moderate at worst but "aggravated by movement." Id. After an exam, the physician concluded that

---

[1] In his application, plaintiff also alleged degenerative disc disease, obesity, and asthma, none of which resulted in a finding of disability by the ALJ. These three impairments, however, are not the focus of plaintiff's Motion to Reverse. As such, the Court will not delve into the medical records for those impairments.

2

plaintiff's "[range of motion] [was] painful, with all movement," and that he had "tenderness over the deltoid, left side." Id. Plaintiff's X-ray showed "no fracture or dislocation," and the "[s]oft tissues, bony structures and joint spaces [were] normal." R. 472. Plaintiff was discharged with a diagnosis of shoulder sprain, placed in a sling, and told to follow up with an orthopedic doctor. R. 397.

On September 13, 2011, plaintiff had his first visit with Wei Yang, M.D., a specialist in Internal Medicine at The Medical Group in Beverly, MA. R. 479, 485. Dr. Yang's treatment notes from this visit state that plaintiff "had multiple visits here [at the Medical Group] for chronic pain involving his upper and lower back, left shoulder, hips and knees. Pain has been constant, 7/10, for the past two years." R. 485. She also wrote that "[n]othing seems to be able to control his pain . . . except for Vicodin which he uses sparsely and seems to 'take the edge away.'" Id. Dr. Yang recorded that plaintiff's "pain [was] exacerbated from a recent [motor vehicle accident] on 8/22/11 during which he was rear-ended. He now [complains of] constant 8/10 left shoulder pain and worsening upper and lower back pain, making him unable to work. The [X-ray] for spines were negative." Id. Her physical exam of plaintiff's left shoulder showed "no deformity, swelling or erythema [redness of the skin], positive tenderness over the anterior, lateral and upper shoulder, limited [range of motion] for

3

extension, abduction, external rotation, unable to lift arm above the shoulder." R. 487-88. Under the "Neurologic" section of the physical exam, she wrote: "No gross motor or sensory deficits, [c]erebral function intact with normal sensation. Deep tendon reflexes are normal and symmetrical. Muscle strength 4/5 with left upper ext[remity] due to pain." R. 488. Dr. Yang's "impressions" included a "likely rotator cuff injury," and she recommended an "MRI [magnetic resonance imaging scan] and orthopedic consult, [and] pain control with Vicodin until [plaintiff] sees Northshore pain management." Id.

According to Steven M. Defossez, M.D., an MRI on September 20, 2011, revealed "mild to moderate tendinopathy [disease of a tendon] of the anterior aspect of the distal infraspinatus [a thick muscle in the rotator cuff] tendon. There is mild distal supraspinatus [a small muscle in the upper back] tendinopathy. The distal teres minor [an elongated muscle in the rotator cuff] tendon and subscapularis [a large muscle connecting several bones in the shoulder] tendon appear intact. No significant fatty atrophy of any of the rotator cuff muscle bellies is identified." R. 493. After reviewing these results, Dr. Defossez noted his "impression" that plaintiff suffered from "[m]ild/moderate distal supraspinatus tendinopathy" and "[m]ild distal supraspinatus tendinopathy," but that "[n]o rotator cuff tear [was] identified." R. 494.

On October 12, 2011, plaintiff went to the Northeast Hospital

4

Corporation Emergency Room with a chief complaint of left shoulder pain "worse than it has been." R. 491. Joshua Lerner, M.D., examined plaintiff and found "the left shoulder reveals no asymmetry when compared with the right," a "tenderness to palpation superiorly and posteriorly over the left shoulder," "no signs of a shoulder effusion," and "some mild tenderness when I adductor [sic] the shoulder passively and less tenderness with flexion and extension." R. 491-92. Dr. Lerner's impression was that plaintiff suffered from "left-sided shoulder pain, chronic, and secondary to tendinopathy of the infraspinatus and sepraspinatus distally." R. 492. He discharged plaintiff with a prescription for Vicodin and a sling and recommended that plaintiff "call tomorrow for an appointment [with a shoulder specialist] as soon as possible." Id.

At a follow-up appointment on October 24, 2011, Dr. Yang noted that plaintiff was "having 8/10 back pain as baseline and 10/10 pain when using his left shoulder. He could not raise his left arm over his shoulder. He can only hold his new baby of 6 weeks old for 5 minutes. . . . He is waiting for his insurance approval in order to [follow up] with Northeast [Hospital] [s]houlder [specialist] Dr. Mc[L]aughlin." R. 480. Dr. Yang made the same notes in the Physical Exam section regarding the left shoulder and neurologic findings as she had at the previous appointment on September 11, 2011. R. 482, 487-88. For his shoulder pain, she recommended exercise and warm compressions, a follow-up with the shoulder

5

specialist, and a refill of the Vicodin prescription. R. 483.

**B. Treating Physician Medical Source Statement**

On October 6, 2011, after examining plaintiff during his first appointment and reviewing the MRI results, Dr. Yang completed a medical source statement to assist a determination by the Social Security Administration ("SSA") of plaintiff's ability to do work-related activities. R. 476-79. Dr. Yang wrote up her assessment before plaintiff visited the Northeast Hospital Emergency Room on October 12, 2011, and before his follow-up with her on October 24, 2011. R. 480-84, 491-92. On this form, Dr. Yang stated that plaintiff had the following limitations due to his impairments: plaintiff can "occasionally lift and/or carry" less than 10 pounds, plaintiff can only stand and/or walk for less than 2 hours in an 8-hour workday, and plaintiff has a reaching limitation in all directions. R. 476-77. As justification for the reaching limitation, Dr. Yang wrote, "Patient has left shoulder rotator cuff tendinopathy. Any activities including overhead which exacerbate the pain should be avoided for the tendinopathy to heal." R. 477. Dr. Yang also noted pushing and/or pulling limitations resulting from the "limited range of motion [and] tenderness" of the left shoulder; full limitations to any crawling or stooping; limitations to occasional climbing, kneeling, and crouching; and a limitation

to frequent balancing.[2] R. 478.

**C.   State Agency Non-Examining Medical Consultants' Evaluations**

Two state agency, non-examining consultants completed Physical Residual Functional Capacity ("RFC") Assessments of plaintiff. The assessments done by Marcia Lipski, M.D., on April 30, 2010, R. 219-26, and by John Jao, M.D., on November 1, 2010, R. 252-59, were completed months before the onset of plaintiff's left shoulder impairment (motor vehicle accident on August 22, 2011). Neither doctor reviewed a medical source statement. R. 225, 258.

Dr. Lipski's RFC assessment lists back pain as the primary diagnosis, with no other indications of a secondary diagnosis or other alleged impairments. R. 219. Dr. Lipski concluded that plaintiff was limited to occasionally lifting/carrying 20 pounds; to frequently lifting/carrying 10 pounds; and to standing, walking, or sitting for about 6 hours in the workday. R. 220. Dr. Lipski also found that plaintiff was limited to frequent balancing and occasional climbing, stooping, kneeling, crouching, and crawling. R. 221. Notably, Dr. Lipski did not find any reaching limitations. R. 222.

Dr. Jao's RFC assessment listed degenerative disc disease as

---

[2] In the SSA form filled out by Dr. Yang, "[f]requently means occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous)," and "[o]ccasionally means occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)." R. 478; accord R. 219, 252 (same definitions in state agency non-examining medical consultants' SSA evaluation forms).

7

the primary diagnosis, obesity as a secondary diagnosis, and asthma as another alleged impairment. R. 252. Dr. Jao's findings are largely identical to Dr. Lipski's, except that Dr. Jao found that plaintiff was limited to frequent, rather than occasional, climbing, kneeling, crouching, and crawling. R. 254.

**D. Plaintiff's Testimony**

On November 29, 2011, plaintiff, represented by counsel, appeared and testified at an administrative hearing before ALJ Constance D. Carter. R. 23, 30-54. Plaintiff stated that his shoulder injury resulted from a car accident on August 22, 2011, and that his left shoulder was fine prior to that. R. 36-37. Plaintiff testified that he "ha[s] trouble lifting even a gallon of milk," "occasionally" has trouble lifting ten pounds, and does not pick up his three-month-old daughter because "it hurts too much." R. 36, 47-48. He also informed the ALJ that he is currently taking Vicodin, but that it "does not make all the pain go away." R. 49. It only "allows [him] to sleep, . . . maybe lift [his] daughter, not be in as much pain, be a little bit more comfortable." Id. Plaintiff testified that he had trouble reaching and lifting prior to his shoulder injury due to back problems, but it "hasn't gotten any better since [he] injured [his] shoulder." R. 49-50. Plaintiff further admitted that, even if a job did not involve much lifting or standing, he could not "concentrate and focus 40 hours a week on work tasks" due to either the pain or the Vicodin. R. 52-53.

8

### III. STANDARD

**A.   Statutory and Regulatory Framework**

A claimant seeking disability insurance benefits under the Social Security Act must prove that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant "must have a severe impairment(s) that makes [him] unable to do [his] past relevant work or any other substantial gainful work that exists in the national economy." 20 C.F.R. § 416.905(a) (internal citation omitted).

The Commissioner uses a five-step sequential evaluation process to assess a claim for disability benefits. See 20 C.F.R. § 404.1520(a)(4); see also Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982). The evaluation will end at any step in the process if it is determined that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4). The steps are as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's [RFC] is such that he or she can still perform past relevant work, then the application is denied; and 5) if the applicant, given his or her [RFC], education, work experience, and age, is unable to do any other work, the application is

granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

A claimant's "impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [he] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). His RFC is "the most [he] can still do despite [his] limitations" and is assessed "based on all the relevant evidence in [his] case record." Id. The RFC is used to determine if he can perform his past relevant work or if he can adjust to other work (i.e., if he can do any other job that "exist[s] in significant numbers in the national economy"). Id. § 404.1560(b)(3), (c)(1).

The claimant bears the burden of proof on steps one through four. The SSA bears the burden of proof at step five to present evidence of specific jobs that the applicant can still perform. See Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

**B.  Standard of Review**

The Court may only set aside the ALJ decision if it resulted from legal error or if the factual findings were not supported by substantial evidence. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). For findings of fact, "even if the record arguably could justify a different conclusion," the Court must affirm the decision "so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir.

1987). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). The Court will examine the record in its entirety to determine the weight and "substantiality" of the evidence. Rohrberg v. Apfel, 26 F. Supp. 2d 303, 306 (D. Mass. 1998).

The Court reviews the ALJ's conclusions of law de novo. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996) (citing Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982)). However, remand is not necessary if it "will amount to no more than an empty exercise." Dantran, Inc. v. U.S. Dep't of Labor, 171 F.3d 58, 73 (1st Cir. 1999). Where application of the correct legal standard could support a different conclusion, the agency's decision must be remanded. Ward, 211 F.3d at 656; see also Dantran, 171 F.3d at 75 (holding that, while the "customary rule" is to remand once a court "sets aside an agency determination," remand is unnecessary despite legal error in the "rare case in which the facts admit of only one plausible legal conclusion").

## IV. PROCEDURAL HISTORY

Plaintiff filed his application on December 10, 2009, and alleged a disability onset date of December 4, 2009. R. 116. His application was denied first on May 11, 2010, and again upon reconsideration on November 2, 2010. R. 70-72, 74-76. On November 29, 2011, an administrative hearing was held before ALJ Carter. R. 11, 23.

On December 13, 2011, the ALJ issued a decision that plaintiff was not disabled under the Social Security Act. R. 11-20. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since December 4, 2009. R. 13. At step two, the ALJ found that plaintiff suffered from the following severe impairments: degenerative disc disease, obesity, and asthma. Id. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (20 C.F.R. pt. 404, subpt. P, app. 1). R. 14.

Next, the ALJ assessed plaintiff's RFC and found he was "limited to occasional climbing . . . balancing, stooping, kneeling, crouching, and crawling," and that he therefore possessed the capacity to perform "less than the full range of sedentary work." Id. Although plaintiff's treating physician, Dr. Yang, completed a medical source statement attesting to a severe shoulder impairment and a resulting reaching limitation, the ALJ found Dr.

Yang's evaluation "largely unsupported by objective findings and inconsistent with the longitudinal treatment record." R. 17. The ALJ thus did not include this impairment or resulting limitation in her findings. Id. Based on the RFC, the ALJ found at step four that plaintiff was unable to perform any of his past work as personal care attendant, delivery driver, metal worker, retail manager, security guard, laborer, store clerk, or dishwasher. R. 18.

At step five, the ALJ examined whether plaintiff could perform other jobs available in the national economy. The ALJ found that plaintiff could not perform any past relevant work. R. 18. After hearing the testimony of a vocational expert, the ALJ found that, based on plaintiff's RFC, age, education and work experience, he would be capable of performing jobs that exist in significant numbers in the national economy, including charge account clerk and "assembly worker jobs that include but are not limited to eye glass assembler." R. 19. The ALJ therefore concluded that plaintiff was not disabled under the Act. R. 20.

On February 13, 2012, plaintiff requested review of the ALJ's decision by the Appeals Council, which denied the request on January 7, 2013. R. 1-3, 5. Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by failing to consider whether his shoulder impairment could be expected to last for 12

13

months.[3] To find disability under the Social Security Act, a claimant must suffer from a severe impairment that "can be expected to result in death or which has lasted <u>or can be expected to last</u> for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added); <u>accord</u> 20 C.F.R. § 404.1505(a). The ALJ concluded that plaintiff's left shoulder impairment did not satisfy the "duration requirement" because, by the date of the hearing, his impairment had not lasted for 12 months. R. 13-14. However, the ALJ did not address whether it could be expected to last for 12 months. <u>Id.</u> The plain language of the statute and regulations demonstrates that the ALJ must consider whether the impairment has already lasted for 12 months; <u>and</u>, if not, whether the impairment could be expected to last for 12 months. 20 C.F.R. § 404.1509; <u>see also</u> Social Security Ruling 82-52 ("the disabling impairment(s) . . . must be expected to result in death, or must have lasted (or be expected to last) for at least 12 continuous months from the date of onset"). As such, the ALJ's failure to determine if the impairment could be expected to last for 12 months was legal error.

---

[3] Plaintiff also argues that the ALJ improperly granted little weight to the medical opinion of plaintiff's treating physician, failed to include a reaching limitation as part of plaintiff's residual functional capacity, and relied on the wrong hypothetical question posed to the vocational expert. The Court does not reach these arguments, as they involve issues to be addressed on remand.

14

If a reviewing court finds that the ALJ committed legal error, the court must then consider whether, after correcting that error, substantial evidence exists to support a different conclusion. See Ward, 211 F.3d at 656. The ALJ found the shoulder impairment "non-severe" because it "ha[d] not yet persisted for the requisite twelve-month period." R. 14. Because the ALJ failed to address the expected duration of the impairment, no further evidence was considered at this point.

The Court looks to other facts found by the ALJ and in the record to determine if substantial evidence exists to support a conclusion that plaintiff's shoulder impairment could be expected to last for twelve months. The ALJ relied on the following evidence to determine that the plaintiff was not entitled to disability insurance benefits: (1) medical records from before the onset of the shoulder impairment (motor vehicle accident on August 22, 2011); (2) two RFC assessments by state agency non-examining consultants from before the onset of the shoulder impairment; (3) medical records from after the onset of the shoulder impairment; and (4) Dr. Yang's medical source statement from after the onset of the shoulder impairment. R. 13-18. The first two groups, produced before the onset of the shoulder impairment, do not provide any evidence regarding how long the impairment could be expected to last. As for the third group, the emergency room documentation of the shoulder impairment states that plaintiff had a "Shoulder

15

Injury" or "SHOULDER SPRAIN" upon discharge; and the MRI from September 2011 contains objective identifying information about the impairment but nothing as to how long the impairment could be expected to last. R. 397, 493-94. Notably, neither the emergency room records nor the MRI rule out the possibility that the impairment could last for 12 months. Regarding the fourth group, Dr. Yang found that plaintiff's shoulder injury caused a limited range of motion and an inability to raise his arm above his shoulder. R. 487-88. She found the injury serious enough to warrant a visit to a shoulder specialist as well as a Vicodin prescription. R. 488. At plaintiff's second visit, Dr. Yang noted "10/10 pain when using his left shoulder," and that "[h]e could not raise his left arm over his shoulder." R. 480. The extent of the injury was consistent: Dr. Yang's physical exam notes for the follow-up were the same as those for plaintiff's initial visit, as were her recommendation of a shoulder specialist and prescription of Vicodin. R. 482-83. While not conclusive as to the duration of plaintiff's shoulder injury, Dr. Yang's medical opinion contains no objective findings to indicate that plaintiff's shoulder injury could <u>not</u> be expected to last for 12 months. R. 476-79.

Other evidence in the record provides further support for finding that plaintiff's impairment could last the requisite 12 months. Plaintiff's emergency room visit on October 21, 2011, for increasing shoulder pain resulted in another prescription for

16

Vicodin and a recommendation that he schedule an appointment with a shoulder specialist "as soon as possible." R. 492. Plaintiff also stated at the administrative hearing that up to a third of the time of an eight-hour workday, he has trouble lifting ten pounds. R. 47. Although he had difficulty reaching and lifting prior to the car accident due to back and other problems, plaintiff testified that these difficulties have not improved since the onset of the shoulder injury and that he is currently taking Vicodin for the pain. R. 49-50. Plaintiff's testimony is consistent with Dr. Yang's medical opinion and does not support a determination that the shoulder injury will <u>not</u> last 12 months.

By contrast, some of the evidence regarding plaintiff's shoulder injury could support a finding that his shoulder impairment would not last 12 months. His initial emergency room visit after the accident indicated that the shoulder injury was moderate at worst, resulted in "no fracture or dislocation," and was diagnosed as a shoulder sprain. R. 396-97. Dr. Yang, during plaintiff's initial visit, found that his shoulder muscle strength was still "4/5" despite the injury. R. 488. The subsequent MRI revealed "mild to moderate tendinopathy" but did not identify any tearing of plaintiff's rotator cuff. R. 493-94. In addition, plaintiff's emergency room visit on October 12, 2011, resulted in similar findings by Dr. Lerner. R. 492.

17

The evidence regarding the potential duration of plaintiff's injury is mixed; but, based on Dr. Yang's medical source statement and the paucity of other medical evidence produced after the motor vehicle accident, remand would result in more than an empty exercise and is warranted. See Dantran, 171 F.3d at 73.

## VI. ORDER

The Court **DENIES** both plaintiff's Motion to Reverse (Docket No. 15), and defendant's Motion to Affirm (Docket No. 20). The Court **VACATES** the Commissioner's decision that plaintiff is not disabled under the Social Security Act, and **REMANDS** the case for further proceedings consistent with this order.

    /s/ PATTI B. SARIS
    Patti B. Saris
    Chief United States District Judge